**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nichol Royston,<br><br>   Plaintiff,<br><br>v.<br><br>City of Scottsdale, et al.,<br><br>   Defendants. | No. CV-22-00542-PHX-SMB<br><br>**ORDER** |

Before the Court is Defendant City of Scottsdale's Motion for Summary Judgment (Doc. 51) and the required Statement of Facts (Doc. 48) on Plaintiff Nichol Royston's claims for discrimination and retaliation under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), Family and Medical Leave Act ("FMLA"), and Families First Coronavirus Response Act ("FFCRA") asserted in her First Amended Complaint (Doc. 20). Plaintiff filed a Response (Doc. 59) and controverting Statement of Facts (Doc. 60), to which Defendant filed a Reply (Doc. 61). The Court has considered the parties' briefings and will grant the Motion on all counts.

**I.     BACKGROUND**

The relevant undisputed facts are as follows. Plaintiff began working with Scottsdale Police Department ("SPD") nearly twenty years ago. (Docs. 48 at 1 ¶ 1; 60 at 2 ¶ 1.) She was one of two Police Aids within SPD's Vehicle Impound Unit (the "impoundment role"). (Docs. 48 at 1 ¶ 4; 60 at 2 ¶ 4.) The job required in-person attendance for ten hours a day, four days a week. (Docs. 48 at 2 ¶¶ 5–6; 60 at 2 ¶¶ 5–6.)

The job duties also included attending administrative hearings, staffing an impoundment services window, and releasing vehicles. (Docs. 48 at 2 ¶¶ 9–10, 13, 16; 60 at 2 ¶¶ 9–10, 13, 16.) Police Aids could also be assigned to the Photo Enforcement Unit, which typically staffed three Police Aids tasked with processing photo radar tickets and attending and participating in related hearings (the "traffic ticket role"). (Docs. 48 at 4 ¶¶ 18–20; 60 at 2 ¶¶ 18–20.) In general, Police Aids have the same rank, title, and salaries across units and are subject to reassignment based on performance or need. (Docs. 48 at 4–5 ¶¶ 24–26; 60 at 3 ¶¶ 24–26.) Police aids could also be placed on patrol.

In June 2019, Plaintiff found out she was pregnant and used all her FMLA leave by April 2020. (Docs. 48-1 at 115–116; 48-11 at 26.) In August 2020, Plaintiff began emailing her supervisors, Alex Ristuccia and Lieutenant Christopher DiPiazza, complaining about coverage issues. (Docs. 48 at 6–8 ¶¶ 33, 48; 60 at 3–4 ¶¶ 33, 48.) She was also concerned about stress, working alone, and being unable to take time off because her only other co-worker had preapproved vacations. (*Id.*; Doc. 48-11 at 6, 32, 40–42.)

In October 2020, Plaintiff was diagnosed with neuroendocrine tumor that required time off for treatment and surgery. (Docs. 48 at 10 ¶ 62; 60 at 5 ¶ 62; 59 at 3.) Plaintiff notified her supervisors of the diagnosis. (*Id.*) On November 9, 2020, she emailed her supervisors that she planned to use short-term disability benefits for the surgery and related ailments. (Docs. 48-11 at 10, 26; 48 at 10 ¶ 67.) Mr. Ristuccia indicated that he would work with "her and [human resources] to determine the best path forward." (Docs. 48-11 at 26; 48 at 10–11 ¶ 67.) Plaintiff went on the disability leave for nine weeks beginning on November 30, 2020. (*Id.*; Doc. 48-8 at 43.) While Plaintiff was on leave, a traffic ticket role opened that Lt. DiPiazza thought could help alleviate her stress and coverage concerns. (Docs. 48 at 11 ¶¶ 69–70; 60 at 5 ¶¶ 69–70.) Plaintiff applied for the role. (Docs. 48 at 11 ¶¶ 71–72; 60 at 5 ¶¶ 71–72.) In the ensuing weeks, one of the three employees in the traffic ticket role retired and the only other employee in the impoundment role had plans to retire soon. (Docs. 48 at 11–12 ¶¶ 73, 77; 60 at 5 ¶¶ 73, 77.) Lt. DiPiazza became concerned that the available employees, excluding Plaintiff who was still on leave, could not

adequately cover the impoundment hearings and ticketing matters. (Doc. 48 at 13 ¶¶ 83–87; 60 at 6 ¶¶ 83–87.)

Plaintiff returned from leave on February 1, 2021, but continued taking days off for medical reasons. (Docs. 48 at 13 ¶¶ 88–89; 60 at 6 ¶¶ 88–89; 48-8 at 43.) On February 11, 2021, the only other employee working the impoundment role retired, leaving coverage gaps. (Docs. 48 at 13–14 ¶¶ 90–92; 60 at 6 ¶¶ 90–92.) Plaintiff requested help, stating that "[she] d[idn't] feel good" recovering from her surgery. (Docs. 48 at 14 ¶ 94; 60 at 6 ¶ 94; 48-1 at 16.) Up to this point, Plaintiff's doctors reported to Defendant that Plaintiff could work without restrictions. (Doc. 48 at 14 ¶ 96; 60 at 7 ¶ 96.) On February 16, 2021, Plaintiff interviewed and was offered the traffic ticket role—with caveat that her transfer would occur later because SPD need to find and train her replacement. (Docs. 48 at 14–15 ¶¶ 98–101; 60 at 7 ¶¶ 98–101.)

The next day, Plaintiff texted Mr. Ristuccia that she would need to take another day off for temporary medical reasons but was concerned about missing more work. (Docs. 48-11 at 27–28; 60 at 17 ¶ 279.) Mr. Ristuccia told her that she could not get in trouble for taking medical time off and to take the time she needed. (Doc. 48-11 at 27–28.) On March 2, 2021, Plaintiff had an adverse reaction to a COVID-19 vaccination, which required her to take three FFCRA leave days. (Docs. 48-8 at 43; 60 at 18 ¶ 281.) The persistent absences prompted Lt. DiPiazza to email Commander Matt Evans about the impoundment window closing in Plaintiff's absences, causing the Unit to fall behind. (Docs. 48 at 15–16 ¶¶ 108–10; 60 at 7 ¶¶ 108–10.) Lt. DiPiazza noted that he understood Plaintiff's prior leave and continuing medical issues, but her absences were a burden and the same coverage issues would persist in the traffic ticket role. (Docs. 48 at 16 ¶ 111; 60 at 7 ¶ 111.) Up to this point, Plaintiff had not asked for an accommodation and had only asked for help because she was the only one left in the impoundment role. (Docs. 48 at 14 ¶ 94; 60 at 6 ¶ 94; 48-1 at 16, 142.)

Commander Evans and Assistant Chief Richard Slavin scheduled a meeting with Plaintiff's supervisors and human resources to address her absences. (Docs. 48 at 17–18 ¶

120; 60 at 8 ¶ 120.) On March 17, 2021, the group met and sympathized with Plaintiff's health challenges, but otherwise upheld that her absences impacted SPD's ability to maintain its services. (Docs. 48 at 19–20 ¶¶ 128–29, 131–35; 60 at 8–9 ¶¶ 128–29, 131–35.) Lt. DiPiazza found that temporary staffing was not a solution because the impoundment role required extensive training. (Docs. 48 at 20 ¶ 136; 60 at 9 ¶ 136.) The group concluded that, given Plaintiff's "only limitation was that [she] could not go to an assignment with an operational requirement" risking closure, they could reassign her to a patrol role, which would give her the flexibility she needed and keep SPD's services functional. (Docs. 48 at 21 ¶¶ 139–41; 60 at 9 ¶¶ 139–41.) Assistant Chief Slavin wanted to remove Plaintiff from her impoundment role entirely. (Doc 48-8 at 132.)

On April 1, 2021, Lt. DiPiazza informed Plaintiff that they were reassigning her to patrol, a decision based in part on Plaintiff's stresses from coming to work sick and thinking her absences let the team down. (Docs. 48 at 21–22 ¶¶ 142–49; 60 at 9 ¶¶ 142–49.) Plaintiff said she "was happy that [she] was leaving the [impoundment role]." (Docs. 48 at 23 ¶¶ 151–54; 60 at 9–10 ¶¶ 151–54.) Plaintiff asked for a station officer position or for an "office job" that was not on the road. (Docs. 48 at 24 ¶¶ 158, 160; 60 at 10 ¶¶ 158, 160.) A station officer position, however, had in-person operational requirements, and even so, none were available. (*Id.*) She was told the patrol role was a lateral move, had the same pay, and was not a demotion. (Docs. 48 at 25 ¶ 164; 60 at 10 ¶ 164; 48-1 at 39.) Plaintiff became increasingly upset about going on patrol. (Docs. 48 at 25 ¶¶ 165–66; 60 at 10 ¶¶ 165–66.) On April 7, 2021, Plaintiff asked about unavailable station officer positions again, but was given her top choice within the available patrol assignments. (Docs. 48 at 26 ¶¶ 171, 173–74; 60 at 10 ¶¶ 171, 173–74.) Later that month, news of Plaintiff's displeasure reached Lt. DiPiazza, which lead Commander Evans to place the transfer "on hold until further notice." (Docs. 48 at 26 ¶¶ 176–77; 60 at 11 ¶¶ 176–77.) Plaintiff never worked a day in that patrol role. (Doc. 48 at 26 ¶ 174; Doc. 60 at 10 ¶ 174.)

On April 16, 2021, Lt. DiPiazza told Mr. Ristuccia not to help with manning the impoundment window, which had taken him away from his supervisory duties. (Docs. 60

at 18–19 ¶¶ 286–87; 61 at 10.) Then, on April 19, 2021, the impoundment window "was very busy, but manageable" while Plaintiff was working. (Docs. 60 at 19 ¶ 288; 60-1 at 2.) She did not request help. (*Id.*) Later that day, Plaintiff had a stress-induced "migraine episode" at work sending her to an emergency room. (Docs. 48 at 27 ¶¶ 178–79; 60 at 11 ¶¶ 178–79.) Plaintiff suffered from what was most likely a complicated migraine but had been evaluated for an acute stroke. (Docs. 48 at 27 ¶¶ 180–81; 60 at 11 ¶¶ 180–81; 48-10 at 17–27.) Plaintiff proceeded to file a workers' compensation claim with the Industrial Commission of Arizona, in which she claimed issues related to workplace stress. (Docs. 48 at 27 ¶ 182, 36 at ¶¶ 261–62; 60 at 11 ¶ 182, 15 ¶¶ 261–62.) Plaintiff also sought counseling to address her stress. (Docs. 48 at 36 ¶ 264; 60 at 15 ¶ 264.)

On April 30, 2021, Plaintiff's oncologist sent Defendant a FMLA packet indicating Plaintiff was unable to perform her essential job functions and requested that she transition to light duty work. (Docs. 48 at 27–28 ¶¶ 187–89; 60 at 11 ¶¶ 187–89.) While the request was pending, Plaintiff met with Chief Jeff Walther to request a transfer to a position other than patrol, and preferably to the unavailable station officer position because of what she called "heat-intolerant" cancer. (Docs. 48 at 28–30 ¶¶ 190, 202, 205, 212–13; 60 at 12 ¶¶ 190, 202, 205, 212–13.) Chief Walther and Assistant Chief Slavin allowed Plaintiff to work a desk position to avoid placing her in the heat. (Docs. 48 at 30 ¶¶ 213–14; 60 at 13 ¶¶ 213–14.) Plaintiff also began asserting a flurry of discrimination and unfair treatment complaints, to which the Chiefs asked her to submit them in writing. (Docs. 48 at 31 ¶¶ 215–18; 60 at 13 ¶¶ 215–18.) By May 11, 2021, Plaintiff's FMLA application was approved. (Docs. 48 at 28 ¶ 193; 60 at 12 ¶ 193.) Plaintiff submitted her written complaints the following day. (Docs. 48 at 31 ¶ 218; 60 at 13 ¶ 218.) A few days later, Plaintiff received notice of the denial of her workers' compensation claim. (Docs. 48-10 at 244.)

Defendant initiated an investigation into Plaintiff's complaints of retaliation, unfair treatment, and discrimination. (Docs. 48 at 41 ¶¶ 220–21; 60 at 13 ¶¶ 220–21.) By August 25, 2021, an investigator concluded the complaints were unsubstantiated and sent the findings to Plaintiff. (Docs. 48 at 32 ¶¶ 223, 225; 60 at 13 ¶¶ 223, 225.) Defendant planned

to hold an "interactive dialog" with Plaintiff to evaluate possible workplace accommodations. (Docs. 48 at 32–33 ¶¶ 226–29, 233; 60 at 13–14 ¶¶ 226–29, 233.) At the meeting on September 1, 2021, the parties went over a form identifying essential functions of the job and any accommodations she might need. (Docs. 48 at 33 ¶¶ 238–41; 60 at 14 ¶¶ 238–41.) Plaintiff did not request an accommodation at that time. (Docs. 48 at 34 ¶¶ 248–49; 60 at 14 ¶ 248–49.) Plaintiff concluded her light duty and returned to full duty on September 27, 2021. (Docs. 48 at 35 ¶ 252; 60 at 15 ¶ 252.)

About a month later, on October 29, 2021, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge against Defendant, claiming disability discrimination and retaliation. (Docs. 48 at 35 ¶ 259; 60 at 15 ¶ 259; 48-1 at 142.) Then, on November 4, 2021, Plaintiff applied for, but did not receive, a transfer to the Sex Offender Unit. (Docs. 48 at 35 ¶ 253; 60 at 15 ¶ 253.) On January 4, 2022, the EEOC issued Plaintiff dismissal and right to sue notices related to the charge. (Docs. 36 ¶ 260; 60 at 15 ¶ 260.) Plaintiff filed her initial Complaint in this Court on April 4, 2022. (Doc. 1.) Then, on April 6 and 7, 2022, the parties sought and received approval of a settlement agreement in the workers' compensation case. (Docs. 48 at 37 ¶ 271; 60 at 16 ¶ 271.) Plaintiff thereafter filed her First Amended Complaint, alleging violations of the ADA (Count One), the RA (Count Two), the FMLA (Count Three), and the FFCRA (Count Four). (Doc. 20.)

## II.     LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of a case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)–(B). The Court may also enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court views evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor without making credibility determinations or weighing the evidence. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 253, 255 (noting the substantive evidentiary standards guide the Court's determinations).

The movant has the initial burden to demonstrate the basis for summary judgment by "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If the movant meets its burden, the burden shifts to the nonmovant to establish a genuine issue of material fact. *Id.* at 1103. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Zenith Radio*, 475 U.S. at 586. Bare assertions alone are insufficient, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 247–50 (citations omitted).

## III. DISCUSSION

### A. The ADA Claim

Plaintiff claims disability discrimination, failure to accommodate, and retaliation under the ADA. (Doc. 20 at 12.) Plaintiff generally alleges four adverse employment actions in support of the claims: (1) transfer from the impoundment role to patrol; (2) recission of the transfer to the traffic ticket role; (3) denial of overtime and compensatory time opportunities while on light duty; and (4) not being selected for the Sex Offender Unit. (Docs. 48 at 38 ¶ 274; 60 at 16 ¶ 274.)

   *i.  Exhaustion of administrative remedies*

Defendant first argues Plaintiff failed to exhaust her administrative remedies with the EEOC before filing suit. (Doc. 51 at 16.) Specifically, Defendant contends that

Plaintiff only made one "clear allegation" in her EEOC charge, thus she failed to allege each "discrete alleged discriminatory or retaliatory act" she now claims in her First Amended Complaint. Plaintiff, however, argues an EEOC charge does not require such specificity and the Court may consider reasonably related allegations. (Doc. 59 at 8–9.)

Exhausting administrative remedies is a prerequisite to establishing the Court's subject matter jurisdiction over the ADA claim. *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002). A complaint may encompass any discrimination reasonably related to the allegations in the charge. *Id.* ("[S]ubject matter jurisdiction extends over all allegations of discrimination that either 'fell within the scope of the EEOC's *actual* investigation or an EEOC investigation *which can reasonably be expected to grow out of the charge of discrimination.*'" (emphasis in original) (quoting *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002)). Civil claims are reasonably related where they are consistent with the original theory of the case. *B.K.B.*, 726 F.3d at 1100 (noting courts should generally construe EEOC charges liberally). The Court may consider such factors as the alleged basis for discrimination, specific dates, the parties involved, and location. *Freeman*, 291 F.3d at 636.

Plaintiff's EEOC charge indicates: (1) "On or around 10/28/2020 [she] informed [her] supervisor of [her] disability"; (2) "On or about 2/11/2021, [she] requested a reasonable accommodation by asking for additional help"; (3) "On or about 2/16/2021, [she] was interviewed for the position of police aid within [the] photo enforcement unit"; (4) Lt. DiPiazza rescinded her offer on April 1, 2021 and "placed her back on patrol which exasperated [her] disability, resulting in [her] admission to [the] [e]mergency room"; (5) she returned to work on light duty on May 6, 2021; and (6) "[she] believe[s] that [she] had been discriminated in that [she] was denied accommodation(s) and denied a position in retaliation of requesting an accommodation." (Doc. 48-1 at 142.)

Plaintiff seemingly abandoned her argument regarding the Sex Offender Unit and did not address Defendant's argument on that point. (Doc. 51 at 8–9.) Notably, Plaintiff applied for the position after she filed the EEOC charge. The EEOC may investigate

- 8 -

conduct that occurs after the filing of a charge, but this generally occurs where a party alleges a number of discriminatory acts that suggest a pattern of continuing violations. *See Sosa v. Hiraoka*, 920 F.2d 1451, 1457 (9th Cir. 1990); *Greenlaw v. Garrett*, 59 F.3d 994, 1000 (9th Cir. 1995). Plaintiff's EEOC charge contained a single retaliation allegation related to recission of the pending transfer to the traffic ticket role because of her disability. There is no indication in the EEOC charge of a pattern of retaliation, nor any reasonable inferences of such conduct to draw from its sparce facts. *Cf. Sosa*, 920 F.2d at 1457–58. Moreover, Plaintiff admitted that she has no evidence of retaliation related to the Sex Offender Unit assignment beyond mere speculation. *See United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

The remaining allegations stem from information in the EEOC charge. Upon Plaintiff claiming that she informed her supervisor of her disability and requested an accommodation, the EEOC would have reasonably investigated what the disability was and the reasons for not providing the accommodations. Further, the EEOC would have reasonably investigated the decisions surrounding the recission of the reassignment, placement on patrol, reason for the hospital visit, and conditions of her light duty work and associated compensation when she returned. Therefore, Plaintiff failed to exhaust her administrative remedies for claims related to her unsuccessful application to the Sex Offender Unit but sufficiently asserted the other allegations Defendant disputes to exhaust her administrative remedies. Thus, summary judgement is appropriate on the retaliation claim related to the application to the Sex Offender Unit.

        *ii.    Discrimination and failure to accommodate claims*

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Employers have a legal duty to reasonably accommodate the "known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A). To state a prima facie case for discrimination, Plaintiff must demonstrate: "(1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job

with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of h[er] disability." *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (2003).

Defendant first argues that Plaintiff is not disabled person under the ADA. (Doc. 51 at 18.) Under 42 U.S.C. § 12102(1), "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *See also* 29 C.F.R. § 16030.2(g)(2) (referring to these subsections as the "actual disability," "record of," and "regarded as" prongs respectively). The Court need not decide whether Plaintiff's cancer qualifies as a "disability" because assuming it does, she fails to establish she is otherwise qualified for the traffic ticket role.

Defendant argues that Plaintiff is not a "qualified individual with a disability" because she could not perform the essential functions of the impoundment and traffic ticket roles. (Doc. 51 at 21–22.) The term "qualified individual" means: "[A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Ninth Circuit has set forth a two-step inquiry to make this determination. *See Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1127–29 (9th Cir. 2020) (citing 29 C.F.R. § 1630.2(m)). First, the determination whether "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires." *Id.* Second, "whether, 'with or without reasonable accommodation,' the individual is able to 'perform the essential functions of such position.'" *Id.* (citation omitted). If a disabled person cannot perform a job's essential functions, even with a reasonable accommodation, the ADA's employment protections do not apply. *Cripe v. City of San Jose*, 261 F.3d 877, 884–85 (9th Cir. 2001). The burden falls on the employee to demonstrate that she can perform the essential functions of a job with or without a reasonable accommodation. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). But an employer has the burden of establishing what job functions are essential. *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012). A job

function may be essential if: (i) the reason the position exists is to perform that function; (ii) there are a limited number of employees available who can perform that function; or (iii) the function requires specialization or expertise. 29 C.F.R. § 1630.2(n)(2). Evidence of what is essential includes the employer's judgment, written job descriptions, and the amount of time spent performing the function. 29 C.F.R. § 1630.2(n)(3); *see also* 42 U.S.C. § 12111(8).

Defendant asserts that the essential functions of both roles necessitate in-person attendance. (Doc. 61 at 6–7.) Specifically, to attend court, testify in court, or conduct administrative hearings. (Doc. 51 at 22.) Defendant points to a job description listing the essential functions, which includes many administrative duties but also attending court and testifying in court. (Doc. 48-1 at 150.) Additionally, "standard operating procedures" required two of the three employees in person for court days, which involves about five hearings an hour. (Docs. 48 at 4 ¶ 21; 60 at 2 ¶ 21; 48-8 at 124.) Employees are also generally required to maintain regular and reliable attendance. (Docs. 48 at 5 ¶ 28; 60 at 3 ¶ 28; 48-9 at 105.) Defendant has met its evidentiary burden in establishing these essential functions. *See* 29 C.F.R. § 1630.2(n)(3). Plaintiff contends transferring her to the traffic ticket role would have allowed her to work from home or flex her time for medical appointments but does not argue against the essential functions Defendant asserted. (Doc. 59 at 12.)

Under the first step in the inquiry, it is undisputed that Plaintiff was originally slated for the role, thus presumably she had the requisite qualifications. The dispute primarily centers on whether Plaintiff established that she could perform the essential functions of the traffic ticket role. Albeit, with an accommodation allowing work from home and flex time. The Ninth Circuit has recognized a general rule that an employee who does not come to work cannot perform essential job functions. *Samper*, 675 F.3d at 1239 (finding a nurse's essential job functions may not have included transcribing details about treatments but did include providing the treatment in-person in the first place). An employer may reassign an employee to a vacant position as a reasonable accommodation, 42 U.S.C.

§ 12111(9)(B), but the ADA does not demand an employer "reallocate essential functions to other employees," *Dark v. Curry County*, 451 F.3d 1078, 1089 (2008). Similar to her impoundment role, she would still have to attend in-person hearings, testify in court, and maintain a regular schedule. The covering employee would perform the essential functions *for* Plaintiff during absences, rather than assisting in the performance of such functions. *See Samper*, 675 F.3d at 1240 (refusing to allow a plaintiff to ask for a reasonable accommodation that exempts her from an essential function); 29 C.F.R. Pt. 1630, app. § 1630.2(o). Further, Plaintiff seeks an accommodation that would effectively exempt her from an essential function. This is not a reasonable accommodation.

Put simply, Plaintiff is not a "qualified individual" because the accommodations she sought negated her ability to perform an essential function in the desired role, thus she fails the second step of the inquiry. 42 U.S.C. § 12111(8).[1]

### iii. Plaintiff's ADA retaliation claim

To establish retaliation a plaintiff must show "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). "Retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). The burden then shifts to the employer to establish legitimate reasons for the adverse employment action. *Id.*; *Brown v. City of Tucson*, 336 F.3d 1181, 1186–87 (9th Cir. 2003). Once the employer meets this burden, it shifts back to the employee to demonstrate with specific and substantial evidence of a genuine issue of material fact as to whether the reason advanced was a pretext. *Brown*, 336 F.3d at 1188. The Court may infer retaliation where an employment decision closely follows complaints of discrimination. *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004); *Bell v. Clackamas County*, 341 F.3d 858, 865–66 (9th Cir. 2003) (concluding temporal proximity between a protected activity and

---

[1] Because the discrimination and failure to provide reasonable accommodation claims fail at this step, the Court declines to address the issues of whether the recission of the assignment to traffic ticket role and subsequent transfer to patrol constitute adverse employment actions or whether those decisions were on the basis of a disability.

an adverse employment action may serve has circumstantial evidence of retaliation).

Plaintiff argues she engaged in a protected activity by making her complaint about retaliation, discrimination, and unfair treatment in early to mid-May 2021. (Doc. 59 at 14–15; *see also* Doc. 20 at 12 ¶ 75.) Plaintiff further postulates she suffered an adverse employment action because (1) her requests for a transfer to the traffic ticket role were denied; (2) she was transferred to patrol; and (3) Lt. DiPiazza ordered Mr. Ristuccia to not help her at the impoundment window. (Doc. 59 at 15.) Defendant argues that it is unclear whether this complaint was actually a protected activity because she did not request an accommodation, but assuming it is, events predating the complaint cannot serve as adverse employment actions to support the retaliation claim. (Doc. 61 at 9–10.) Defendant further argues Plaintiff has failed to establish any retaliatory animus and the available evidence supports the employment decisions were based on resource allocation, not retaliation. (Doc. 51 at 26.)

Defendant is correct that the events prior to the purported adverse employment action cannot support the claim. On April 1, 2021, the month before Plaintiff raised on her complaint, Lt. DiPiazza informed Plaintiff about rescinding the pending transfer to the traffic ticket role. A week later, Plaintiff was given her top choice within the available patrol options, but never worked a day in that role. Plaintiff continued to complain about the patrol transfer leading Commander Evans to place it on hold in mid-April. Around that time, Lt. DiPiazza ordered Mr. Ristuccia refrain from helping Plaintiff with the impoundment window. These events occurred before Plaintiff's alleged protected action, and thus logically cannot serve as the basis for an adverse employment action. *See Shah v. Mt. Zion Hosp. & Med. Ctr.*, 642 F.2d 268, 271 (9th Cir. 1981) (finding a plaintiff failed to establish a "causal link" for retaliation where his complaints occurred after the alleged adverse action).[2]

---

[2] Although occurring before her complaint, Plaintiff expounds that Mr. Ristuccia withholding assistant affected the terms and conditions of her employment. (Doc. 59 at 15.) Plaintiff cites nothing in the record of what those terms and conditions entail. Defendant argues her only evidentiary support is an email from Mr. Ristuccia to himself that reveals Plaintiff, on the day at issue, did not ask for help, help was not needed, and the workload was manageable. (Docs. 61 at 10; 60-1 at 2.) It was simply not Mr. Ristuccia's

To support her assertions about the continued denial of her transfer to the traffic ticket role, Plaintiff contends that at the meeting, after she raised her complaints and renewed her request for the transfer, Assistant Chief Slavin said "[w]ell, now that can't happen." She interpreted this statement to mean "it was off the table because of how the complaints she had raised about her treatment had been perceived by her supervisors." Thus, in her view, denial of the renewed request was based on her complaint and retaliatory. (Doc. 59 at 15–16; Doc. 48-1 at 43–44.) Defendant argues Plaintiff advances no evidence beyond her "interpretation" and that "interpretation" runs contrary to uncontroverted evidence. (Doc. 61 at 10.)

A plaintiff must offer more than a "mere 'scintilla' of evidence" to defeat a properly supported motion for summary judgement. *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). The nonmoving party must introduce "significant probative evidence tending to support the complaint." *Id.* (citation omitted). Even construing the facts in Plaintiff's favor, she offers nothing more than her own speculation based on her perception of the events. Her own anxieties are insufficient to impute motives onto her supervisors to create a genuine dispute of fact when the undisputed evidence shows the decision to rescind the offer was months prior and not based on the complaint. Moreover, Plaintiff has provided no evidence that the initial recission was retracted to reopen the role to her for a subsequent denial to have any impact. Put simply, Defendant could not deny or rescind what was already rescinded. Without more, Plaintiff's lone speculation fails to establish a causal link between her complaint and the denial of the already rescinded transfer. Assuming, however, the evidence did support a causal link, the same evidence establishes that Defendant offered legitimate reasons for the denial—Plaintiff's inability to do the job and staffing availability. Plaintiff's proffered evidence is not substantial nor specific and otherwise fails to show Defendant's reason served as a pretext to retaliate against her. *See Brown*, 336 F.3d at 1188.

As for second purported adverse employment action, Plaintiff was never actually

---

job to man the impoundment window and Plaintiff fails to establish his help was a term or condition of her employment.

- 14 -

transferred to the patrol position she took issue with. After the complaint, Defendant placed Plaintiff at a desk job due to her complaints, stresses, inability to perform the essential functions of the other roles. Plaintiff has failed to show how the desk job supports her retaliation claim. "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in [a] protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000); *see also Brooks*, 229 F.3d at 928 (holding only "non-trivial employment actions that would deter reasonable employees from complaining" about violations constitute actionable retaliation). Defendant notes that the desk assignment has no impact on Plaintiff's compensation, terms and conditions of employment, rank, benefits and had minimal impact on the location and work hours. (Doc. 51 at 23–24.) Plaintiff has advanced no argument to refute the absence of a meaningful impact on her employment as to the desk job. Further, Plaintiff prompted the transfer to alleviate her own concerns. This is hardly a situation that would deter employees from taking similar actions as Plaintiff did here.

Therefore, Plaintiff's retaliation claim fails and Defendant is entitled to summary judgement.[3]

### B. FMLA Claim

Plaintiff claims that Defendant (1) interfered with her rights by violating the FMLA when it rescinded her assignment to the traffic ticket role and (2) retaliated against her by subjecting her to adverse employment action in the form of increased scrutiny of her FMLA file after she complained about Defendant interfering with her rights. (Doc. 20 at 15 ¶¶ 92–93.)

The FMLA's anti-interference provision states that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right

---

[3] Plaintiff appears to abandon her lack of overtime compensation allegations. As Defendant argues, she chose to apply for light duty and was aware that overtime compensation was unavailable while on light duty. (Docs. 51 at 24; 48 at 29 ¶ 196; 60 at 12 ¶ 196.) Plaintiff, therefore, has failed to raise a genuine dispute of material fact and her allegations related to retaliatory or discriminatory disallowance of overtime fails.

provided." 29 U.S.C. § 2615(a)(1). The anti-retaliation provisions prohibit "discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter," and discrimination against any individual for instituting or participating in FMLA proceedings. 29 U.S.C. § 2615(a)(2), (b); *Bachelder v. Am. West Airlines*, 259 F.3d 1112, 1125 n.11 (9th Cir. 2001). The Ninth Circuit has recognized that a violation of the anti-interference provision, 29 U.S.C. § 2615(a)(1), is an issue of interference with rights guaranteed by statute, not discrimination or retaliation. *Foraker v. Apollo Grp., Inc.*, 427 F. Supp. 2d 936, 940–41 (D. Ariz. 2006), *aff'd*, 302 F. App'x 591 (9th Cir. 2008) (citing *Bachelder*, 259 F.3d at 1124 (holding a plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the [interfering] decision")); *see also* 29 C.F.R. § 825.220(c). For interference claims, intent is irrelevant. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011).

The Ninth Circuit has recognized that other circuits have adopted a burden shifting framework for the anti-retaliation provisions. *See Sanders*, 657 F.3d at 777 (collecting cases). Under that framework, the plaintiff must establish a prima facie case of retaliation, and if she does, the defendant must establish a legitimate and nondiscriminatory reason for its action. *Id.* at 777 n.3. If the defendant meets its burden, plaintiff must establish the reason offered is pretextual by showing inconsistencies in the reasoning or unlawful discrimination more likely motivated the action. *Id.* Although the Ninth Circuit has yet to affirmatively address what a plaintiff must prove to establish an FMLA retaliation claim, district courts in this Circuit have applied this framework. *See, e.g.*, *Gonzalez v. City of Glendale*, No. CV-17-04593-PHX-SMB, 2020 WL 5258296, at *7 (D. Ariz. Sept. 3, 2020); *Newell v. Ariz. Bd. of Regents*, No. CV-18-01903-PHX-JAT, 2020 WL 1694735, at *9 (D. Ariz. Apr. 7, 2020). Therefore, this Court will do the same.

Regarding the interference claim, Defendant appears to contend that Plaintiff has not established evidence of an adverse employment decision resulting from her use of leave and her "increased scrutiny" theory is unsupported. (Docs. 51 at 26–27; 61 at 11.) Plaintiff took FMLA related to her pregnancy and birth of her son in early to mid-2020. (Doc. 48-1

at 116.)   As noted, Plaintiff was informed the assignment to the traffic ticket role was rescinded on April 1, 2021.  Plaintiff claims "[h]er leave usage was cited as a reason for the adverse actions."  Plaintiff's only citation to support her claim relates to FFCRA leave she took for three days due to an adverse reaction to the COVID-19 vaccine beginning on March 2, 2021.  (Docs. 59 at 16; 60 at 18 ¶ 281.)  She made no connection to her pregnancy leave and the decision to rescind the assignment the traffic ticket role and relies on mere conclusions.  Plaintiff has failed to show her taking FMLA leave was in fact a negative factor in her transfer.  Thus, Plaintiff failed to establish the interference claim.

Regarding the retaliation claim, Plaintiff claims her FMLA request resulted in "increased scrutiny" of her file.  (Doc. 20 at 15.)  Plaintiff had her oncologist send the FMLA packet over a month after Defendant made the decision to rescind the transfer to the traffic ticket role.  That packet indicated Plaintiff would have multiple medically necessary absences each month and was unable to perform the essential functions of the patrol role.  (Doc. 48-2 at 20–21.)  It is not clear how Plaintiff's requests for light duty and related limitations resulted in adverse employment action when that request indicates Plaintiff was unable to perform the essential functions of the traffic ticket role.  Further, Plaintiff does not appear to dispute that she admitted the only basis for her "increased scrutiny" theory was that the interactive process, which was initiated to evaluate her accommodation needs, stressed her out.  Again, her own feelings are not basis to impute retaliatory motives on Defendant.[4]  (Docs. 48 at 35 ¶ 251; 60 at 15 ¶ 251.)   Therefore, Plaintiff has failed established the retaliation claim.

**C. FFCRA Claim**

Plaintiff does not specify what provision of the FFCRA she asserts her claim under. Between Plaintiff's Complaint and Response, she alleges varying timeframes for when she took FFCRA leave ranging from in November 2020 to March 2021.  (Docs. 20 at 16 ¶ 100; 59 at 16; 60 at 18).  Regardless of the correct month, the FFCRA includes emergency

---

[4] Additionally, the citation to the record to assert a dispute on this fact reiterates legal conclusion without specifying what she considered was "increased scrutiny." (Doc. 48-8 at 28.)

amendments to FMLA adding protections related to the pandemic, which expired December 31, 2020. *See* 29 U.S.C. § 2612(a)(1)(F). Moreover, the protections are for "qualifying need related to a public health emergency in accordance with [§] 2620 of this title." *Id.* In turn, 29 U.S.C. § 2620 refers to a qualifying need as those related leave to care for an employee's child and does not address the employee directly. *See* 29 U.S.C. § 2620(a)(2)(A). The November leave relates to her cancer, not COVID. And all other leave occurred after 29 U.S.C. § 2612(a)(1)(F) protections expired.

To the extent Plaintiff asserts her claim under the Emergency Paid Sick Leave Act ("EPSLA"), the EPSLA does not provide for an interference claim and only addresses discrimination against an employee taking leave. EPSLA § 5104(1); *see, e.g.*, *Alvarado v. ValCap Grp.*, LLC, No. 3:21-CV-1830-D, 2022 WL 19686, at *3 (N.D. Tex. Jan. 3, 2022). Similar to the other retaliation claims, Plaintiff relies on the proximity in time alone to speculate as to Defendant's motivations and has failed to establish any meaningful causal connection. Moreover, Plaintiff provides no explanation as to what the any other adverse actions were. (*See* Doc. 59 at 18.) The controverting facts that follow the lone citation to her reaction to the COVID-19 vaccine, (*see id.*), reveal a discussion about concerns that her absences and staffing challenges made her unfit for the patrol role that she never worked and did not want. (Doc. 60 at 18 ¶¶ 281–83; Doc. 48-8 at 132–34.) For the reasons previously stated, Plaintiff's speculation is insufficient. Therefore, Plaintiff's FFCRA claim fails.

**D. The RA Claim And Injunctive Relief**

In Plaintiff's Response, she concedes that "she is no longer entitled to compensatory damages or injunctive relief under the Rehabilitation Act." (Doc. 59 at 16.) Likewise, Plaintiff further conceded that her request for injunctive relief is moot. (*Id.* at 17.) Thus, the Court will grant summary judgment in Defendant's favor as to the RA claim and deny Plaintiff's request for injunctive relief.[5]

---

[5] Defendant argues under a theory of collateral estoppel to bar Plaintiff's claims, but because the Court grants summary judgment on all claims it need not address the issue.

## IV. CONCLUSION

Accordingly, Plaintiff has not established sufficient evidence or the necessary elements of her claims against Defendant to survive summary judgment.

**IT IS THEREFORE ORDERED** granting Defendant's Motion for Summary Judgment (Doc. 51) with prejudice.

**IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment accordingly and terminate this case.

Dated this 23rd day of September, 2024.

_____
Honorable Susan M. Brnovich
United States District Judge